Our final case for argument today is 23-1668, Copan Italia Spa v. ITC. Mr., is it Wodarski? It is, thank you. Mr. Wodarski, please proceed. Thank you. May it please the Court, at issue in today's appeal is the International Trade Commission's determination that not one, but three separate claim limitations should be construed to exclude the inventor's own device. We're still concerning two of these claim terms, oriented manner, perpendicular. The Commission's construction makes the claims impossible to practice. Counsel, when you say exclude the patent owner's own device, you mean commercial device, right? No, I don't mean that. I mean the preferred embodiment, which was before the examiner early in prosecution as the physical device. So, it's the preferred embodiment. Well, hold on, time is cut off. There's the preferred embodiment and there's the physical device. They may or may not be the same thing. Understood. I agree with that. And I would agree with that, Your Honor. Okay. And your specification uses the word perpendicular to mean the same thing as normal, right? I would say that ordered manner is taught in the specification to be normal to the surface and perpendicularly, yes. So, I would say it begs the question of what those two things mean in the context of the patent and its teachings, the entire intrinsic record. But I agree that normal and perpendicularly were directed at communicating the same teaching. And there's one thing that's kind of interesting to me here. It seems like the board said look perpendicular is pretty close to 90 degrees, which of course would be, I think, any layman's understanding of the word. And I think that's a fair decision. Is it right that you're saying that that's not the way it would be construed by people still in this particular part? That's correct, Your Honor. And I think that's what we grapple with. It came up with the idea that... Like there's plain meaning, but it's got to be plain meaning to a person in this art. Exactly, Your Honor. Which would be the textile art and electrostatic clocking arts. And you're saying those people wouldn't understand it to be 90 degrees or pretty close to 90 degrees. They would not. As a matter of fact, that would be an impossible result to achieve. But what would they understand it to be? They would understand that it means it stands up straight from the surface to be clocked. Is that language anywhere in the specification? I believe it is, Your Honor, in column 3, 43 to 51. When you understand what's being discussed there is you've oriented the fibers or aligned them by subjecting them to an electrostatic field. And with that alignment they're directed towards the adhesive, the tip of the swab. And they're anchored or deposited to create the ordered manner. And what the specification teaches in column 3, Your Honor, is that as a result of that the finished swab is able to maintain that ordered arrangement where you have the right dimensional and value characteristics of the fibers to use. And there you seize the invention because indeed in this manner, as it says, starting at column 3, 47, indeed in this manner the capillary represented by each fiber, by virtue of which it can carry out its task of absorbing and releasing essentially the same quantity of specimen, remains unimpaired and functional. Two important points there, Your Honor. One, the specification, for good reason, never talks about 90 degree or angles. And that's because each fiber simply needs to stand up and perform its function as a capillary within the invention. The concern I'm having with your argument is that, you know, yes it's a person of ordinary skill in the art of reading the specification. But it doesn't say just stand up. It doesn't say, it says very clearly, and we're talking about notice, right? It's important because somebody reading this patent should be able to understand what the words are covering. And what the specification, which is quite short, says is that these fibers are substantially parallel to each other and normal to the surface of the rod. I mean, and then there's nothing in here that makes me think perpendicularly should have a different meaning than the ordinary meaning. And that's important because of the public notice function of patents. Somebody reads this and then they try to understand what that word means. There's nothing in your specification that suggests that perpendicular has a different meaning in the context of your invention, how you've described it. I understand that, Your Honor. I disagree with that. As we noted, figure two by itself, as the illustration of what's being taught, does not have fibers that are normal to the surface, Your Honor. I would also note that within the prosecution history, the applicant precisely said in response to an early office action, this is at Appendix 6806, in the 2008 office action, the fibers must stand upright to ensure the correct functionality, namely high absorbency and high release. They must also have the correct density to micronize the sample to enable the collection in a quantitative way. Was that language said before or after perpendicularly was added to the claim? Your Honor, I believe it's in discussing perpendicular. Okay. I think it raises another point, Your Honor. When we look at all this and we're talking about a person skilled in the art, two things. The specification does talk about that you do things according to established electrostatic clocking processes. Then some of the authority cited within the patent specification refers people to authority that talks about successful electrostatic clocking. Again, as Dr. Mickelson had stated during his testimony- I'm sorry, Your Honor. Why didn't the claims, if your view is that clocking is enough, why didn't the claims just say clocked instead of using the term perpendicular? I believe because as Dr. Mickelson stated, Your Honor, and as the applicant grapples with the examiner during the discussion of Buzzy and the 027 prosecution, you can actually try to electrostatically clock not in a way to achieve what the industry understands as clocking, but because of the limitations of normal clocking in the electrostatic chamber, the person who knows the processes knows that you're going to get variability. What you're going to get is a fiber that stands up, and so the industry understands that's what we call perpendicular. That's Dr. Mickelson's testimony in the record below, Your Honor. That because the people who know how to do this and would have read this specification know that you will never achieve perpendicularity. And I would note both experts agreed to that. The interpretation doesn't require perplexion. Well, then that becomes a separate issue, Your Honor. That says close to perpendicular, right? The construction that Dr. Guido offered that the commission embraced turns it into close to 90 degree perpendicularity. That's a construction the commission applied, which we believe is legally erroneous. I would note in that end, Your Honor, that during prosecution, one of the major issues that's discussed in the briefing was substantially was in proposed claim language for substantially perpendicular. The examiner said that introduced an indefinite term and created a standard that wasn't clear to understand the claim limitation. I would suggest we amended to take that out to cure that infirmity, allowing this construction by the commission to just put back in close to it. Whether it's substantially or close to, you've created the same problem, which is there is no longer a clear standard from which Copen or any member of the public can understand whether the claim limitation is met. I would say it's worse than that here, Your Honor, though. The commission never grappled with, under its construction, these are hundreds, if not thousands of minuscule, almost impossible to see fibers to the human eye. How would anyone ever attempt, if a 90 degree or close to 90 degree angle is required of each of these fibers in the layer, how would one go about ever even proving, assuming it was a clear standard, how could I go about proving I've ever met a clear standard? Well, I mean, maybe you shouldn't have used the word perpendicular. I understand. I mean, you know, problems like this inert to the claim drafter, right? Well, I think I would respectfully disagree, Your Honor, and I'd say I didn't use 90 degrees, and then I'd go back to the point you raised. Were you the person that drafted it? I wasn't. No. But I would go back to your- I'm just wondering if I actually just insulted you personally or just your client's back. I'm trying to avoid insulting you personally. Neither, Your Honor. Happy to have the dialogue, but I guess I would go back to your point at the outset is that we didn't use 90 degrees. It doesn't appear anywhere in the claims or in the specification, and again- What about the, and I realize this comes from the examiner and not your client, but in the office action on 6781, it looks to me like the examiner was understanding the use of the word perpendicularly and the word parallel in a manner in which normal people would understand them and not somehow specifically different as in the art. So can you address that portion of the prosecution history? Because the board side or the ITC cited that as supporting their construction. Yeah, understood, Your Honor, and again, first, we didn't acquiesce to that, and I think we have to understand that all of these prior art references that were addressed during examination, none of them were flock swabs or meant for the collection of biological specimens. So in trying to overcome the- Did you disagree? You said you didn't acquiesce in the examiner's observation, but did you disagree with it? I believe, Your Honor, if you understand the passage from the prosecution history that I cited where we were always trying to-  Do you have any pages? Yes, Your Honor. It's appendix 6806, the response to the February 25th, 2008- Exactly which statement are you relying on? It's volume one. The quote is, the fibers must stand up to ensure the correct functionality, namely high absorbency and high release. And that, Your Honor, is a very succinct articulation of the invention. The problem I'm having is that there's nothing on that page that you've cited to us that is talking about what perpendicular means. It says they must stand up, but there's nothing saying- I don't even know if this is talking about a claim that had the word perpendicular in it. Your Honor, I believe it is, but two points on that. Again, going to Judge Moore's original conversation with me, I believe we're talking about someone who is skilled in the art of textiles and electrostatic flocking. The record below, I think, very amply establishes that a person there would understand perpendicular there does not mean 90 degrees. So if I look at page 6797 to 6798, that's the claim that this discussion you're relying on is talking about. And I don't see the word that we're talking about today in that claim. So I'm having a hard time understanding why this is something that is relevant. You can take a look at it. It's 6797 to 98. It does have substantially parallel to each other and normal, but nonetheless. And again, this page you're citing is not talking about perpendicular. I understand, Your Honor. I believe when we talk about normal and perpendicular, again, to the question and answer I had with Judge Moore, that we're talking about normal and perpendicular are describing... They're synonymous. You're saying they're synonymous. And I agree with that, Your Honor. And then it begs the question about how they're defined within the context of this teaching and this patent. And again, I don't think the applicant ever gave anyone any indication that it should be fairly taught as 90 degrees. The figure two of the patent... Okay, I have a dumb question, but, you know, appendices are long, and so I respect the fact that you only give us portions of documents that are relevant to what we need to decide. You're citing 6806, and I can't tell you what this comes from. It's clearly an applicant response of some sort. Is it a response to that office action on 6781, or was this an applicant response that preceded the office action on 6781? I don't know, Your Honor, from my notes. I know that it's a response to the office action dated February 25th, 2008. February 25th, 2008. And am I correct in understanding that the claim 10, that that portion you're referring to is actually recited on pages 6797 to 98?  You cited a page to us that's referring to what's recited in claim 10. Yes. And I'm wondering if the claim 10 that it's referring to, just for confirmation, is the claim 10, which is at 6797 to 98. 6797? 6797? Yes, Your Honor. Thank you. I would also like to discuss, Your Honor, as well. I have a moment. The oriented manner limitation of claim 741, unless you'd like me to remain on the perpendicular. Counsel, you're almost out of all your time and all your rebuttal time. And you have to win in multiple arguments to prevail, right? So why don't you just be committed on oriented manner so you can make your strongest argument on that. Thank you, Your Honor. I think oriented manner would have lived with the commission's determination had it been as originally stated on page appendix 66. The problem is that's not the construction that was applied. Instead, on appendix 69, the second sentence was added, the permissible deviation from the common orientation is an issue of fact. I think at that point, Your Honor, it speaks about this 90-degree attributes and perpendicular attributes of claim limitation that's not in this patent. And again, I believe it created a standard that we don't know how it can be met and is indefinite. All we needed to do under the clear teaching of the specification was subject the fibers to an electrostatic field which would align those fibers such that they could be anchored into the adhesive. So if the ALJ and the commission ultimately had embraced just that original proper construction, I believe that the limitation was properly construed and would have been met by the evidence below. I would say, Your Honor, that I would just ask that I believe, you know, the reality of where we are arguing this matter in December 2023 with patents that end in March of 2024, I think we face one of three outcomes, affirmance that we believe legal error should preclude. Otherwise, I'm sensitive to the fact now that either this court would believe it could not get to a full appellate decision within the remaining life of the patent, which I think would require the final determination below to be vacated and the appeal to be dismissed. And I believe that this court believes that it could come to a full appellate decision on this matter. It raises the somewhat interesting issue of if it believed with me that there's legal error, it would remand. And I would agree then with the commission's attorney on brief that we're now at a point where it would be futile, and I think as a reasonable extension of Texas Instruments and the LSI opinions, it would be another circumstance where established practice would argue for vacating the final determination and looting the appeal. I guess I'm a little confused about what you just said. You're saying your patents are expiring in March 2024, so an exclusion order is going to be ordered both after that time. Is that right? One would not be available after that time. Right. So what is it you're asking us to do as a result of that? Based on the legal error, Your Honor, I believe that the established practice from Texas Instruments and LSI is that there would be an order to the commission that they vacate the final determination based upon the legal error and with instruction for the investigation to terminate because of the expiration of the patents. And then this appeal would be dismissed. And can I ask you something? Did you file for an expedited review of this case? Yes, we did, Your Honor. And did you do expedited briefing? Yes, we did, Your Honor. As a matter of fact, we lived with the schedule imposed by the court, and we self-expedited our reply so that everything would be fully briefed the second week of July. Did you formally ask for expedited briefing, or did you self-expedite? No, we asked for formal briefing, and then even under the schedule set by this court, we put our brief in before the due date. Oh, okay. Excellent. And so is it being argued now also on an expedited basis? Did we advance the case for argument? Did you all ask for an expedited oral argument as well? I believe we did, Your Honor. I know, Your Honor, the decision came down. When we actually filed our notice of appeal before the commission's decision was published in the Federal Register, we immediately negotiated with the commission. I believe under the happenstance standard. You acted promptly and quickly. I would hope that would be the case, in your mind, Your Honor. I believe the happenstance standard is met here, and unfortunately the circumstances where we are, if you agree with us on legal error, I believe that that's the court's decision. Okay, thank you very much. Thank you. I'll restore two minutes of rebuttal time. Ms. Chen, please proceed. Good morning, Your Honors. May it please the Court, I'd like to first confirm what Chief Judge Moore and Judge Stoll recognized, that the commission agrees with the recognition that the preferred embodiment is not the same as the commercial embodiments that the co-pan supposedly showed to the museum. You say agrees it's not the same. You mean, theoretically, they don't necessarily have to be the same, or in this case, they are in fact different? In this case, there's no evidence that they were the same. Co-pan alleged domestic industry swabs below, and the proceedings below this report is domestic industry. There's no evidence that the commercial embodiments that were showed to the examiner during prosecution are the same as the domestic industry swabs. It was never produced in discovery. It was not even in discussion during the hearing. So there's no evidence as to even what swabs were shown to the examiner. That's the first point. Second, the co-pan's counsel mentioned figure two as supporting co-pan's construction, and figure two, again, was not argued below, but even looking at what the specification discloses regarding figure two, the specification says at column three, lines 12 to 17, that figure two is showing the uniform thickness of the fiber layer, and it says nothing about the actual fiber orientation, the fiber shown in figure two. So it does not support co-pan's construction that perpendicularly means merely standing up at different angles. So what do you think of the quality of that drawing? I think it's a little hard to tell. I don't know if you're able to figure out things from drawings necessarily. We do have some case law on that that says we shouldn't be able to rely on drawings for relative measurements and such. Do you have any view on the quality of the drawing itself and whether it shows, because some of these look like they're perpendicular. Well, I think that goes towards what I was saying, that figure two was not, I believe, shown to demonstrate fiber orientation, what angle these fibers are. The specification at column three, lines 12 to 17, merely states that figure three is to show that the fibers are a uniform thickness, and I think that you can clearly see from figure two. And that's all we can take from the specification is what the specification says regarding uniform thickness. Was the argument made below, and if so, how was it ultimately resolved that it would be impossible to manufacture products of this nature that result in truly perpendicular or close to perpendicular uniformity across the swab? Was that argument made below, and if so, how did the ITC resolve it? The argument was made below during clean construction. But COPAN's counsel is mischaracterizing Dr. Guido's testimony and intervener's expert. Dr. Guido did not say that it's impossible to manufacture swabs with close to 90-degree angles. What he testified is, to this date, it hasn't been achieved perfect perpendicularity of all the fibers on the fiber layer. But that's not what the commission's claim construction requires. The commission's claim construction is close to 90 degrees in view of the prosecution history regarding applicants' statements regarding Buzzy and the Griffiths prior art. The other issue about impossibility to prove infringement, I believe COPAN's counsel had mentioned that for the infringement issue, COPAN's infringement theory relied solely on the fact that these swabs were accused swabs, and its domestic industry swabs were manufactured using electrostatic flocking. It did not discuss respondents' flocking process. It did not look at the fiber orientations. The only images of the fiber orientations on the record for infringement came from intervener's expert, who included SEM images of these accused swabs and showed that the fibers were at random angles. And Dr. Mikkelsen, COPAN's expert, agreed that these fibers were at different orientations. If I may move on to COPAN's counsel also mentioned that none of the prior art discussed during the prosecution related to flock swab for collecting biological specimens. That's just entirely not true. That language comes from the preamble of the claims, and at no point did applicants dispute the examiner's finding that the preamble was satisfied by those prior art. If I can make two more points. One, COPAN's reply brief at pages 12 and 25 to 29 argues for the first time that the commission misapplied its claim constructions. This argument was not made in COPAN's opening brief, nor did COPAN challenge infringement under the commission's claim constructions in the proceedings below, neither before the AOJ or the commission. This court should find COPAN forfeited its infringement arguments in its reply brief. And finally, I believe COPAN's counsel now recognizes that even if it were to prevail on appeal, it's very unlikely that remand proceedings that the commission would conclude and relief can even possibly issue before the patents expire. COPAN had attempted to expedite this appeal. The court, in this court order, said that COPAN can self-expedite its briefing, but it rejected COPAN's argument that the commission needed to expedite its response brief. I believe this argument was expedited because it was calendared as soon as joint appendix was filed. It was calendared at the next available date. But, of course, this court does not need to wait several months for the patents to expire. If the court agrees with our claim constructions, the court can affirm the commission's finding of no violation. I'm happy to answer any further questions. Thank you very much. Thank you. Mr. Nesbitt. Mr. Nesbitt. Good morning. May it please the court, Brian Nesbitt on behalf of Intervenors. I'd like to address first the issue of can stand-up be supported as a definition for perpendicular. There is no intrinsic support for that. What COPAN's counsel just read to you from A806 was a 2005 statement. If you look at the prosecution history when they address the fibers on Buzzy or Griffiths, which happened after that time, those fibers clearly stood up from the surface of the swab. And what did COPAN say about that? They said that those fibers are not perpendicular. That should end the inquiry right there. They told the public that fibers that stand up are not perpendicular. And I think that's all the court needs to resolve its decision. What page did they do that on? They did that on A30537-40, A19044, and A13309, and A18950. What they really relied on down below for the stand-up definition was their expert. And what the commission found down below was that even COPAN's expert rejected the stand-up definition. And they did that at A61. Specifically, COPAN's expert testified that fibers that are standing up are not perpendicular, and that's at A30532. He also testified that standing up and perpendicular are not exact synonyms, A30532 again. He also testified that perpendicular is talking about how it is related to the surface a bit more, so that perpendicular refers really to what the fibers around it are. Sorry to interrupt, I know you went on very quickly, but I was trying to look at your cites, and the last one you asked, A18950. What it says on that page, would you like me to look at? The word perpendicular doesn't seem to appear. I mean, I haven't read it closely, but would you want me to take away from that page? Sure, so on A18950-1, what the applicant says is the flocked fibers as shown in figure 2B of Griffiths are not normal to the surface. Let me grab the appendix. And that's at the very top. Yes, I see where they say that, and what is it that you want me to understand? That this is fibers that have been flocked, but they're not normal? Is that what I'm supposed to take away? If you look at the figure of Griffiths, what it shows is a surface of the swab, and the fibers are standing up from it. And I'm looking to see if that's it. Well, no, I can't just look at the figure in Griffiths, and I can't make an assessment that the fibers are standing up. That's silly. Well, the ITC addressed this. Let me see if I can... The ITC addressed it on appendix 60, and it shows what the statement Koeppen made here means relative to the figure in Griffiths, the prior art. And in appendix 60, they show figure 2B. They show the fibers on it. I don't understand. So you're saying the ITC looked at the figure and made a determination about whether things are or aren't standing up? The ITC found or analyzed Griffiths. They analyzed the prosecution history, too. And what the ITC concluded is the statements that Koeppen made about Griffiths, It's that applicant distinguished Griffiths on the ground that it doesn't show normal or perpendicular, right? That's absolutely right, Your Honor. And the fibers, if you look at 2B, they stand up off the surface. And just to be even more clear, this prosecution history was distinguished on the basis of normal being in the claim language, and then later perpendicular was added, right, or changed the claim. How did that work? I think this claim language used the word normal. There was a finding the ITC made that normal and perpendicular were the same. And that's not challenged on appeal? It is not, yeah. And then if you look at the next page, appendix 61, it's the same thing but a different piece of prior art. You see the swab. You see the statement that they made in the prosecution history. And the swab has fibers that stick up from the surface or stand up from the surface. And what the applicant said there, to be more specific. I think you want 19044 where they say uniform thickness of fibers, normal, do not show a normal layer of that. Do not show a layer of uniform thickness of fibers, normal from the surface. That's right. Yep. The fibers were extending transversely or slanted. That's what they say. So it seems like there is clear support in later prosecution. Maybe they had a broader understanding of what it meant later. I don't understand where that came from. But later in prosecution, they clearly disavowed anything close to standing up. They disavowed substantially perpendicular. And that's what the examiner found below as well. They had claimed substantially perpendicular. The examiner looked at that and said, in your statements about Buzzy and Griffiths, you had disavowed substantially perpendicular. And that's when they got rid of substantially perpendicular, when they claimed perpendicular. So that, too, would add to the point that there is no basis to claim perpendicular means stand up. And I see I'm out of time, Your Honor, unless there's more questions. Nope. Thank you very much, Counsel. Thank you, Your Honor. I understand my time is short, so I'll just try and make four points. The first, Your Honor, is that I heard some conversation about only if some of the fibers were perpendicular. I think if that's the case, if that's the construction, I don't understand it to be the construction, then I think the undisputed testimony is we've been met. The construction is that every fiber within the layer must be perpendicular. I would say on the impossible to practice, Your Honor, Dr. Guido, respondent's expert below, testified that in the real world, posita isn't stupid and would understand that you'd come nowhere close to 90 degrees. So ultimately, that testimony runs up against the proposed construction that he offered as a posita that he knew was impossible to practice. My third point, Your Honor, you raised a very good point about buzzing Griffiths. I would say that this close to 90 degrees creates this indefinite problem that the commission made worse by imposing buzzy and Griffiths as guideposts. Neither of those references use 90 degrees or perpendicular. I have no idea from the commission's determination how I'm supposed to use them as guideposts. So we've taken a less than clear standard problem that was cured during prosecution. So the guideposts are what the applicant said about them. I understand, Your Honor, and then if that's the case, if that's literally what it's limited to, then again, we get back to begging the question, and I think that's where Dr. Mickelson's testimony is consistent. What he was saying in discussing the same issue is that we have no idea whether these were electrostatically flocked, first of all, for example, in buzzy, and if you did, whether you were trying to promote a perpendicular alignment by electrostatic flocking. It is possible to orient an electrostatic flock, and as Dr. Mickelson said, get it wrong. And you could have fibers that are slanted and transverse. You could have them so that they lay down to the adhesive surface and don't allow for the interstices to provide absorption by capillarity. All of these discussions were in the context of performing the inventive function. That is absorption by capillarity. All of that is consistent. But I have no idea, Your Honor, other than to say using them for guideposts that slanted and transverse fibers would not meet it. I still have the indefiniteness problem where I don't know when I'm within close to 90%. You're out of time. You said four things. I'm trying to be generous. What's your last thing? Thank you, Your Honor. I would just say from everything we've heard today, I want to just remind us of the standard. Obviously, exceptionally clear is the standard to render something impossible to practice. To the extent we have some ambiguities or discuss different plausible orientations to some of the things we've discussed today, I believe that the fact that we're having that discussion means it's not exceptionally clear. Thank you for your time, and I ask that you today take the final determination. Thank you. All council cases taken are submissions.